IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BOBBY JOE COOKSEY,<br><br>Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD, et al.,<br><br>Respondents. | CV 16-120-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

Petitioner Bobby Joe Cooksey, appearing pro se, seeks habeas corpus relief pursuant to 28 U.S.C. §2254.  Mr. Cooksey challenges the fifty-year prison sentence he received for deliberate homicide in the Fourteenth Judicial District Court, Musselshell County, Montana.  Mr. Cooksey's petition should be denied for lack of merit.

## I.  Procedural History

Cooksey lived in a rural area outside of Roundup, Montana, where he had been party to an ongoing dispute with a neighbor, Tracey Beardslee, over issues surrounding their adjacent properties.  On July 7, 2009, after hearing his dogs barking, Cooksey armed himself and set out to determine the cause of the commotion.  Outside Cooksey encountered Beardslee weed-eating on the margin of the property.  The two men were separated by a barbed wire fence.  A verbal

1

dispute ensued and according to Cooksey, Beardslee became angry and threatened to kill Cooksey.  Cooksey fired one shot, hitting Beardslee in the chest.  Beardslee died as a result of the gunshot wound.

After the shooting, Cooksey returned to his home and reported the incident to 911.  The Musselshell Sheriff and two deputies responded.  Cooksey turned over the weapon he had used and gave a voluntary statement.   Cooksey was charged with one count of deliberate homicide.  In September of 2010, Cooksey proceeded to trial on a theory of self-defense.  A jury convicted Cooksey of deliberate homicide.  *See State v. Cooksey*, 286 P.3d 1174, 1176 (Mont. 2012).

Prior to sentencing, Cooksey filed a motion for a new trial.  (Doc. 10-15). The basis of the motion centered on an event that occurred prior to jury selection. On the morning of the first day of trial, members of the venire waited in the basement of a nearby church, because the courthouse was not large enough to accommodate the large jury pool.  The venire members were monitored by bailiffs and escorted to and from the courthouse.  Apparently, this arrangement had been discussed prior to trial and neither party objected.

Following the guilty verdict, Dr. Mark Lurie, one of the venire members who had been excused prior to voir dire, contacted the defense regarding what he had witnessed in the church basement, and expressed his concern that Cooksey may not have received a fair trial.  (*Id*. at 1-2.)  Specifically, Dr. Lurie indicated

that individuals discussed the facts of the case, potential sentences, and the purported violent and drunken tendencies of Cooksey.  (*Id.* at 2.)  Cooksey argued this misconduct on the part of venire members constituted structural error and requested a new trial.  (*Id.* at 4.)

On December 3, 2010, the trial court held a hearing on Cooksey's motion for a new trial.  (*See* Doc. 10-19).  Dr. Lurie testified, along with other individuals who were either members of the venire or who were members of Cooksey's jury.  A witness for the state, Roy Dickerson, who was also a prospective juror, contradicted much of Lurie's testimony about the atmosphere and what he witnessed to have occurred in the church basement.  Additionally, Dickerson testified that it was Lurie who was talking loudly and continuously about his personal knowledge and general knowledge of the legal system itself.  (*Id.* at 96-106.)  The trial court denied Cooksey's motion for a new trial.  Cooksey was sentenced to fifty years in the Montana State Prison.  *Cooksey*, 286 P.3d at 1176.

Cooksey timely filed a direct appeal arguing: 1) the trial court erred in denying Cooksey's motion for a new trial based upon the juror misconduct; 2) the trial court erred in excluding Cooksey's evidence concerning the presence of the prescription drug Paxil in the decedent's blood; 3) the State should have been required to conduct an investigation into evidence supporting Cooksey's claim of justifiable use of force; and 4) the prosecutor committed prosecutorial misconduct

in his closing argument. *Id*. Cooksey's conviction and sentence were affirmed. *Id*. at 1182-1183. Cooksey filed a petition for writ of certiorari in the United States Supreme Court; it was denied on April 15, 2013.

Next, Cooksey, then appearing pro se, sought post-trial discovery from the Musselshell County Attorney, the Office of the Montana Public Defender, and the Musselshell County Clerk of Court. Although he did not identify what exculpatory evidence he was seeking, he contended that it consisted of discovery that had never been previously produced. *Cooksey v. State*, DA 13-0330, Or. at 1 (Mont. Oct. 16, 2013).[1] The trial court denied Cooksey's motion, observing it was not possible to determine what Cooksey was seeking, and that Cooksey's motion seeking discovery to assist in preparing a post-conviction petition was premature because he had not yet filed the petition or obtained leave from the court to conduct discovery. *Id*.

Cooksey appealed the denial of his motion. The Montana Supreme Court dismissed the appeal without prejudice. *Id*. at 2. The Court observed that Cooksey still had adequate time to file a petition for post-conviction relief, directed him to the discovery statute to be used, and advised Cooksey that in seeking discovery he would need to identify what it was he was requesting. *Id*.

---

[1] The state court briefs and orders are available at:
https://supremecourtdocket.mt.gov/ (accessed March 16, 2017).

4

Cooksey then filed a petition for post-conviction relief.  (Doc. 10-28.)  The petition was apparently accompanied by voluminous exhibits, see, (Doc. 10-31 at 2, ¶ 1), as well as a memorandum and affidavit from Cooksey.  (Docs. 10-29 and 10-30.)  Cooksey alleged ineffective assistance of trial counsel, ineffective assistance of appellate counsel, failure of the prosecution to disclose material, false statements in judicial proceedings, and trial court error.

The State was ordered to respond to Cooksey's petition.  The State responded by arguing generally that Cooksey had failed to meet his burden, and requested the trial court dismiss the matter without any further evidentiary proceedings.  (Doc. 10-35.)  Cooksey filed a reply.  (Doc. 10-38.)  The trial court entered a detailed 61-page order denying and dismissing Cooksey's petition, finding that Cooksey had failed to state any claims upon which relief could be granted.  (Doc. 10-42.)

Cooksey appealed the denial.  (Doc. 10-43.)  The Montana Supreme Court interpreted Cooksey's arguments to be: 1) that the trial court erred by dismissing his ineffective assistance of counsel claim, and 2) that the trial court erred in dismissing Cooksey's claimed violation of the disclosure requirements established in *Brady v. Maryland*, 373 U.S. 83 (1963).  *Cooksey v. State*, DA 15-0130, 2016 MT 99N, Or. at 2 (Mont. May 3, 2016).  The Court held that Cooksey's various ineffective assistance of counsel claims consisted of nothing more than conclusory

5

allegations and were properly dismissed by the trial court. *Id*. at 3. In the same vein, the Court held that because Cooksey failed to establish that a *Brady* violation occurred, the claim was properly dismissed. *Id*. at 4.

## II.  Cooksey's Claims

In his current petition, Cooksey raises three claims: 1) exculpatory evidence was withheld, and because defense counsel failed to address the non-disclosure, Cooksey was prevented from raising the issue on appeal (Doc. 1 at 7); 2) Sheriff Weitzeil was not credible, and trial counsel's failure to challenge his credibility prevented Cooksey from raising the issue on appeal (*Id*.); and, 3) witness tampering occurred following Cooksey's conviction, and trial counsel's failure to disclose a letter detailing the tampering prevented Cooksey from introducing the new evidence and establishing the credibility of Cooksey's witness at the hearing for a new trial. (*Id*. at 8.)

## III.     Analysis

As explained below, because Cooksey cannot overcome the deference due to the Montana Courts' adjudication of his combined *Brady* and ineffective assistance of counsel arguments under Claim 1, this claim must fail. While Claims 2 and 3 both appear to be procedurally defaulted, it is more efficient for this Court to proceed to the merits of each. *See* 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). Both claims fail on their merits. In sum, Cooksey's

petition lacks merit and should be denied.

### i.  Claim 1

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)

applies to Cooksey's petition.  AEDPA substantially limits the power of federal

courts to grant habeas relief to state prisoners.  *Hurles v. Ryan*, 752 F.3d 768, 777

(9th Cir. 2014).  Under AEDPA, a federal court may not grant a prisoner's petition

on a claim that was decided on the merits in state court, unless the state court's

adjudication of the claim:

> 1)  resulted in a decision that was contrary to, or involved an unreasonable
>     application of, clearly established Federal law, as determined by the
>     Supreme Court of the United States; or
>
> 2)  resulted in a decision that was based on an unreasonable determination of
>     the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"'[C]learly established Federal law'…is the governing legal principle or

principles set forth by the Supreme Court [in its holdings] at the time the state

court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  A

state court's decision is contrary to clearly established federal law "if the state

court applies a rule that contradicts the governing law set forth in [the Supreme

Court's] cases" or "confronts a set of facts that are materially indistinguishable

from a decision of [the] Court and nevertheless arrives at a result different from

[Supreme Court] precedent."  *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).

As for an unreasonableness determination, § 2254(d)(2) requires that the state trial court be accorded substantial deference, and its determination should not be superseded on habeas review, even where "'[r]easonable minds reviewing the record might disagree' about the finding in question." *Brumfield v.* Cain, 135 S.Ct. 2269, 2277 (2015) (citations omitted).  "For relief to be granted, a state court merits ruling must be so lacking in justification that there was an error…beyond any possibility for fairminded disagreement." *Bemore v. Chappell*, 788 F.3d 1151, 1160 (9th Cir. 2015).

*Brady* is the clearly established federal law that governs the state's duty to disclose exculpatory and/or impeachment evidence favorable to the defense.  In order to establish a *Brady* violation, a defendant must show: 1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching, 2) the evidence was not disclosed by the prosecution, and 3) the nondisclosure resulted in prejudice to the accused.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The clearly established federal law for ineffective assistance of counsel claims as determined by the Supreme Court is *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on an ineffective assistance of counsel claim, a defendant must establish that his counsel's performance was constitutionally deficient, and that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at

687.

In his post-trial motion seeking discovery and the appeal therefrom, Cooksey failed to identify the information he sought.  *See Cooksey v. State*, DA 13-0330, Or. at 1 (Mont. Oct. 16, 2013).  The same situation apparently occurred during his post-conviction proceedings in state court.  The trial court noted, "Petitioner fails to identify what evidence he contends was exculpatory, how it was exculpatory, and/or how he was prejudiced, if he was prejudiced, by counsel's failure to obtain it." (Doc. 10-42 at 33.)[2]

Nonetheless, the state district court went through Cooksey's exhibits and attempted to identify each item of information Cooksey could have been referencing in his claimed *Brady* violation.  For example, the trial court surmised that Cooksey may have been referring to a video of a law enforcement officer arresting him. (*Id*. at 14.)  The district court noted that if this was the evidence to which Cooksey referred, he failed to explain how the item was exculpatory and could not establish a *Brady* violation.  Additionally, the court noted trial counsel could not have performed deficiently for failing to obtain and/or review the video, because the very video was played at a pre-trial evidentiary hearing held on December 10, 2009. (*Id*.)  Accordingly, Cooksey failed to demonstrate either

[2] Similarly, the trial court also stated Cooksey "failed to identify what evidence he contends that his counsel purportedly failed to obtain much less how such evidence was or is 'exculpatory.'"  (Doc. 10-42 at 14.)

prong of the *Strickland* test.

The trial court also noted that Cooksey appeared to make additional claims that trial counsel failed to investigate and obtain Beardslee's counseling records for impeachment purposes, and failed obtain other "exculpatory discovery" from the state, including dash camera videos from law enforcement patrol vehicles, a cell phone, and a white piece of paper that was hanging out of the victim's pocket. (*Id.* at 25.)

As to the counseling records, the state district court noted that it had made a number of pretrial rulings refusing defense counsel's attempts to obtain Beardslee's records, including medical records. (*Id.* at 26.) The court also noted that, because the rulings were record based, they should have been raised on direct appeal and not in post-conviction proceedings. (*Id.*) Moreover, Cooksey failed to explain how the counseling records could be used for impeachment, or how he was prejudiced by the failure to obtain the records. The claim was denied, accordingly. (*Id.*)

In relation to the dash camera videos, the district court found Cooksey's statement that they contained exculpatory evidence was conclusory. (*Id.*) He failed to demonstrate how the videos were exculpatory, or how he was prejudiced by the failure to procure them. (*Id.* at 26-27.) Therefore, the trial court also found this claim to be meritless. (*Id.* at 27.)

Relative to the cell phone and the piece of paper, it was not clear to the district

10

court that these items were even collected. (*Id*. at 27.) Even if they had been, however, the court found that Cooksey "made no attempt to explain how such evidence was/is 'exculpatory.'" (*Id.* at 27.) Again, the court found this claim to be based on nothing more than speculation and conjecture. (*Id*.)

Finally, because all of these items were only, at best, potentially exculpatory, the trial court determined that Cooksey would have to demonstrate bad faith on the part of law enforcement to establish a due process violation. Cooksey failed to meet this burden. (*Id*.)

The trial court also considered the possibility that Cooksey was attempting to argue trial counsel was ineffective for failing to obtain a copy of the victim's criminal history. The trial court held, much like the victim's medical and counseling records, that defense counsel did attempt to obtain this information, but the request was denied in a pre-trial order. (*Id*. at 28.) The court also again noted that the claim was record based and should have been made, if at all, on direct appeal. (*Id*.) Thus, it was not available for collateral attack in post-conviction. (*Id*. at 28-29.) Additionally, the court found this information to be generally inadmissible under the Montana Rules of Evidence. (*Id*. at 29-30.)

In affirming the trial court's post-conviction order, the Montana Supreme Court noted that Cooksey failed to establish that a *Brady* violation had occurred, and that his claims of ineffective assistance of counsel amounted to nothing more than

conclusory allegations. *Cooksey v. State*, DA 15-0130, 2016 MT 99N, Or. at 3-4 (Mont. May 3, 2016).

Much as he did in the state court proceedings, Cooksey does not identify in his current petition what evidence he believes to have been withheld. (*See* Doc. 1 at 7). As set forth above, because this claim was adjudicated on its merits, Cooksey has the burden to show that the state court decision was contrary to or involved an unreasonable application of clearly established federal law, or that it was based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). Cooksey has entirely failed to make such a showing. He has not established that the state court erred in a manner that would defeat the deference that this Court is to afford the decision under the AEDPA. Because the state court decision was a reasonable one, it must be afforded deference.

### ii.  Claim 2

Although Cooksey raised various issues with Sheriff Weitzeil in his post-conviction petition which were addressed by the trial court (*see* Doc. 10-42 at 16-17, 35), he did not raise the precise claim that he does before this Court. In his current petition, Cooksey appears to argue that his trial counsel performed deficiently for not adequately challenging the testimony and credibility of Sheriff Weitzeil. Specifically, Cooksey states that Weitzeil testified that he went through Beardslee's home and he did not see any firearms. (Doc. 1 at 7.) Cooksey

believes this testimony should have been contradicted by photos taken by the Department of Criminal Investigation that showed "firearms strategically placed throughout alleged victim's home." (*Id.*)

Sheriff Weitzeil testified for the State during its case-in-chief.  As part of his testimony, Weitzeil explained that he wears two hats in Musselshell County; he is the Sheriff and the Coroner.  For this reason, it was the county's policy to call in an outside organization, the Department of Criminal Investigation ("DCI"), to take over an investigation when there was a suspicious death.  In doing so, it would avoid the appearance of a conflict in Weitzeil's dual role as Sherriff and Coroner.  (*See* e.g., Doc. 10-7 at 121:17-25; 122:1-4; 170:19-25; 171:17-24; and 172:1-11).   In accordance with this protocol, Weitzeil made a call on July 7, 2009, requesting to have DCI dispatched not long after responding to the crime scene.  The Musselshell deputies secured the scene, but performed no meaningful investigation. (*See* Doc. 10-8 at 207:9-25).  Musselshell County did not perform its own investigation, but rather assisted the DCI where needed.

Weitzeil was recalled during the defense's case-in-chief.  He was questioned about an individual, Vern Holden, who had been trespassing on the Beardslee/Cooksey property and attempting to access the crime scene prior to DCI's arrival on July 7, 2009.  (Doc. 10-11 at 190-91).  Apparently, deputies searched the property in an effort to locate Holden.  While looking for the suspect, Weitzeil and

the other deputies entered Beardslee's residence. (*Id*. at 191: 8-11.) Holden was ultimately located and arrested. In response to a question about whether or not he saw guns while inside Beardslee's residence, Weitzeil responded, "[n]o. I never seen one." (*Id*. at 191:13.)

At approximately 10:10 p.m. that evening, the crime scene was turned over to Agent Hilyard of the DCI. (Doc. 10-10 at 123.) The crime scene was secured, and Agent Hilyard returned just after 8:00 a.m. the following morning, July 8, 2009, and began his investigation. (*Id*. at 126.) It was Agent Hilyard that performed the search of Beardslee's residence after consent to search had been obtained from Beardslee's family. (Doc. 10-10 at 15-16.)

As a preliminary matter, this Court does not find Cooksey's argument that Sheriff Weitzeil's testimony was not credible to be persuasive. He has not even shown that Sheriff Weitzeil testified inconsistently. When Sheriff Weitzeil entered Beardslee's home, it was not to perform an investigation into the shooting, but to search for the trespasser, Holden. It is entirely possible that while looking for this individual, Weitzeil did not notice firearms within the residence; that was not the focus of his search. Moreover, there is no indication that he was aware of the photos taken by DCI investigators, which Cooksey claims reveal strategically placed firearms. But, even if he were, the existence of photographs, taken at a later time by a different investigating agency, does not undermine or impugn Weitzeil's testimony

about what he personally observed when he entered Beardslee's home during the search for Holden. Contrary to Cooksey's assertion, there is no indication Weitzeil made a false statement during his testimony.

For these reasons, Cooksey cannot establish either prong of *Strickland*. Because it was the DCI and not Weitzeil who was involved in the search of Beardslee's residence and subsequent investigation, it was not unreasonable for defense counsel to choose not to question Weitzeil about the photographs taken by the DCI. In short, counsel's performance was not deficient. *Strickland*, 466 U.S. at 687. Because Cooksey cannot establish counsel erred, he also cannot make the second requisite showing of *Strickland* prejudice – that but for counsel's unprofessional errors, the result of his trial would have been different. *Id*. at 694. Cooksey has not demonstrated that his trial counsel was ineffective in failing to challenge Weitzeil on the firearm issue; consequently, there was no viable claim to preserve and pursue on appeal. Cooksey's claim should be denied for lack of merit.

### iii. Claim 3

Cooksey's final claim is even more difficult to follow, and he does not explain what constitutional violation he believes to have occurred.

Apparently, just prior to the hearing on Cooksey's motion for a new trial, defense counsel received a letter from an individual who had been incarcerated in the Musselshell County Jail. (*See* Doc. 10-44 at 13-14). The writer of this letter, a

15

man identified as Hector Valdez,[3] explained that he had been incarcerated in the

Musselshell County Jail for nineteen (19) months prior to being transported to the

Montana State Prison.  (*Id*. at 13.)  Valdez expressed his feeling that Cooksey may

not have received a fair trial.  Valdez apparently met many people that seemed to

have a preconceived notion that Cooksey was guilty and should be convicted.  (*Id*.)

He believed one or two individuals on the jury were related to employees of the

Musselshell County Sheriff's Department.  He also stated he believed "a couple of

people" from the jury talked to a sheriff's deputy, possibly Shawn Lesnik, in the

booking area.  (*Id*.)  Valdez expressed concerns about the "weapon" that Beardslee

had on his belt.[4]  (*Id*. at 14.)  Valdez offered his assistance to the defense.  This

letter was received by Cooksey's attorney on December 2, 2010.  (*Id*.)  Notably,

this letter made no mention of Dr. Lurie, the primary witness for the defense at

Cooksey's upcoming hearing on the motion for a new trial, nor of threats that

Valdez overheard involving the Musselshell County Sheriff Deputies and Dr.

Lurie.

---

[3] A review of the Montana Criminal Offender Network reveals that an individual named Hector Felipe Valdez-Mendoza was convicted of Sexual Assault in Musselshell County and sentenced by Judge Spaulding to serve 84 months on May 23, 2013.  The offense was alleged to have occurred on March 13, 2009. Mr. Valdez-Mendoza has been deported.  *See* https://app.mt.gov/conweb/Home/OffenderNumber/3004632  (accessed March 16, 2017).

[4] At trial this weapon was identified as a Leatherman tool.  (*See*, e.g., Doc. 10-8 at 38:7-16.)

Months later, apparently after reconnecting with Cooksey at the Montana State Prison, Valdez prepared and signed an affidavit providing greater detail about what he had purportedly witnessed during his time at the Musselshell County Jail. (Doc. 10-44 at 16-20.)  The affidavit indicates that Valdez overheard Deputy Shawn Lesnik tell Rosie, the 911 dispatcher, "that they were going to do everything in their power to prevent Bobby Joe Cooksey from obtaining his appeal even if it meant convincing Dr. Laurie [sic] to recant his original statement."  (Doc. 10-44 at 18, ¶ 11.)  Also, Valdez apparently overheard a conversation between Sheriff Weitzeil, Deputy Lesnik, Rosie, and Aaron Edwards wherein someone commented, "[i]f we can't get Dr. Laurie [sic] to recant his story, the sonofabitch Cooksey was going to cost us another $100,000.00 dollars."  *Id.* at ¶ 12.

According to Cooksey, the importance of the letter is that its author "had no knowledge of whom would be testifying during [the motion for a new trial] hearing, but yet he identified the Deputy was going to make the Doctor recant his testimony."  (Doc. 1 at 8.)  Cooksey believes that had the letter been produced to him and introduced at the hearing, it would have served to verify the truthfulness of Dr. Lurie's testimony that he was threatened because of his involvement in the matter.  (*Id.*)

There are several flaws with Cooksey's reasoning.  First, there is no mention in the December 2, 2010, Valdez letter about Dr. Lurie, or threats being made

toward him regarding his testimony at the upcoming hearing. These allegations do not appear until the Valdez affidavit, which was written four months after the hearing took place.

Moreover, Dr. Lurie testified about the two telephonic threats he had received after coming forward with his observations of the jury venire's actions. (Doc. 10-19 at 32-33.) The first caller asked if Lurie had a son named Daniel, and advised him he "should have thought about that before [he] opened his mouth." (*Id*. at 33:4-8.) The caller then hung up. The second call was similar in nature, but the caller asked if Dr. Lurie had livestock, and again admonished that he should have considered the livestock before coming forward. (*Id*. at 33:9-12.) Dr. Lurie did not testify that the caller told him not to testify at Cooksey's hearing. Lurie reported these calls to the Sheriff's Department. (*Id*. at 34.) His testimony about the calls was uncontroverted at the hearing.

To the extent Cooksey believes Lurie was found to be not credible due to the testimony surrounding the alleged threats he received, he is mistaken. The trial court's credibility determination focused on Lurie's account of what occurred prior to jury selection. Relative to the juror misconduct issue, the trial court made its finding that Dr. Lurie's account of what had occurred in the church basement was not credible after hearing testimony from both Lurie and Dickerson and comparing the two accounts. *Cooksey*, 286 P.3d at 1178. The trial court noted that

Dickerson's observations about Dr. Lurie's behavior in the church basement

coincided with what the court observed during the hearing on the motion for a new

trial.  Specifically, the court said that Dr. Lurie:

> "spoke loudly and incessantly until interrupted by the court and
> counsel;" and that he was "overly eager to talk about his experience as
> a fraud investigator/threat analyst and his purported prior experience
> with the court system"; that his testimony was "self-aggrandizing,"
> and that "he appeared intent on presenting himself in an overly
> virtuous manner" while being "gratified to be the center of attention."

*Id.* (citing trial court order denying new trial).  The Montana Supreme Court found

that the trial court did not abuse its discretion when it rejected Dr. Lurie's version

of events.  *Id.*

To the extent Cooksey attempts to make Dr. Lurie's account credible now,

six years after the fact, his efforts are futile.  The letter and affidavit from Valdez

do not undermine or defeat the trial court's credibility determination.  Moreover,

this Court may only entertain habeas relief on "behalf of a person in custody

pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or law or treaties of the United States."  28 U.S.C. §

2254(a).  Cooksey has not advanced a constitutional violation; thus, he fails to state

a claim cognizable in habeas.[5]  Therefore, this claim should also be denied.

---

[5] The Court takes no position as to the veracity of the information contained
Valdez's letter and affidavit.  The Court's ruling is limited to the relationship those
documents have to the arguments Cooksey has advanced in this case.  *See Guatay
Christian Fellowship v. County of San Diego*, 670 F.3d 957, 987 (9th Cir. 2011).

## IV.    Conclusion

Mr. Cooksey's petition should be denied.  His first claim does not survive deferential review under the AEDPA; his second claim is lacking in merit; and his final claim is meritless and does not state a basis upon which relief may be granted.

## V.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A certificate of appealability ("COA") should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of the constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Mr. Cooksey's petition has not met the standard.  He has not made the substantial showing of a denial of a constitutional right, and because reasonable jurists would not disagree with this finding, there is no reason to encourage further proceedings.  A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

**RECOMMENDATIONS**

1.  The Petition (Doc. 1) should be DENIED on the merits.

2.  The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3.  A certificate of appealability should be DENIED.

**NOTICE OF RIGHT TO OBJECT
TO FINDINGS & RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT**

Mr. Cooksey may object to this Findings and Recommendation within 14 days.[6] 28 U.S.C. § 636(b)(1).  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Cooksey must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."  Failure to do so may result in dismissal of his case without notice to him.

DATED this 20th day of April, 2017.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

---

[6] As this deadline allows a party to act within 14 days after the Findings and Recommendation is "served," Fed. R. Civ. P. 6(d) applies, and three days are added after the time would otherwise expire.